## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN WILLIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-cv-333 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| RANDY PFISTER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| ‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗‗ | ) | |

### <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Brian Willis, an inmate at the Illinois Department of Corrections, went to the hospital for a neurology appointment. He left with a neck and shoulder injury.

Willis was not feeling well that day. He was nauseous and dizzy. He threw up during the ride from the prison to the hospital. When he arrived, Willis complained about his symptoms to a correctional officer, who then brought him a wheelchair.

After his neurology appointment, Willis needed to use the restroom. He asked several correctional officers to remove his restraints or assist him in the bathroom. The officers declined. So Willis got out of the wheelchair, walked into the bathroom, and fell, suffering an injury. He testified that he broke his neck.

Willis later sued the IDOC officers, alleging a violation of the Eighth Amendment. He claims that the officers should have removed his handcuffs, or held him up while he relieved himself. Discovery came and went, and Defendants moved for summary judgment.

For the reasons explained below, Defendants' motion for summary judgment is granted.

**Background**

On May 5, 2017, Brian Willis, an inmate at the Stateville Correctional Center, was transported to the University of Illinois Hospital & Health Sciences System for a neurology appointment.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 1, 9 (Dckt. No. 141).

The parties do not provide the backstory about the reason for that appointment.  The record simply reveals that the reason for the visit was to "get better," which goes without saying.  *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 60 (Dckt. No. 145).  The record does not reveal how often Willis went to the hospital for neurology appointments, either.

The deposition might offer a clue about the reason for the visit.  Willis testified that he had a migraine at the time.  *See* Willis Dep., at 17:12-14 (Dckt. No. 137-1, at 5 of 23); *see also id.* at 14:20-23.  Maybe the appointment was related to migraines, or maybe not.  Whatever the reason, the key point is that correctional officers took Willis to the hospital.  And in the meantime, the officers were responsible for his security.

Two officers took Willis to the hospital:  Defendants Darryl Jefferson and Carol Conditt.  *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 9 (Dckt. No. 141).  Officer Jefferson, a correctional officer, drove Willis to the hospital in a van.  *Id.* at ¶¶ 5, 17.  Officer Jefferson was the officer responsible for supervising Willis on May 5.  *Id.* at ¶ 30.  Officer Conditt was a writ officer responsible for transporting prisoners.  *Id.* at ¶ 2.

Before taking an inmate for a medical visit, officers receive a document called the Offender Health Status Transfer Summary.  *Id.* at ¶ 12.  The document includes medical information about the inmate prepared by Stateville's medical staff.  *Id.* at ¶ 14.

The Transfer Summary for Willis mentioned "migraine headaches" when listing any "Current / Acute Conditions / Problems." *Id.* at ¶ 15. The form did not identify any "Physical Disabilities / Limitations," and did not list any "Assistive Devices / Prosthetics." *Id.*

When Willis left Stateville on May 5, he wasn't in a wheelchair. *Id.* at ¶ 16. He didn't have a medical permit for a wheelchair, either. *Id.* At the time, Willis was not diagnosed with any physical disability. *Id.* at ¶ 11. He was not paralyzed, and did not require a wheelchair to ambulate. *Id.*

Before getting in the van, Willis did not tell Officers Jefferson or Conditt that he was feeling sick. *Id.* at ¶¶ 18–19. During the trip from Stateville to the hospital, Willis never spoke up about feeling ill, either. *Id.* at ¶ 20. Officer Jefferson did not hear anyone state that there was anything wrong with Willis's physical condition. *Id.* at ¶ 21.

The trip to the hospital did not go smoothly. Willis vomited at some point during the ride. *Id.* at ¶ 22. He believes that he vomited at least twice. *Id.* Willis "was having double vision, blurry vision, [his] head was spinning, the room was spinning. [He] was dizzy, nausea [sic], and [he] was vomiting." *See* Willis Dep., at 16:10-12 (Dckt. No. 137-1, at 6 of 23).

After arriving at the hospital, Willis told Officer Jefferson that he wasn't feeling well. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 26 (Dckt. No. 141). Willis did not tell Officer Jefferson that he *had* thrown up. *Id.* at ¶ 23. But Willis did tell Officer Jefferson that he felt "a little dizzy and like he had to throw up." *Id.* at ¶ 26; *see also* Willis Dep., at 39:3-5 (Dckt. No. 137-1, at 12 of 23) ("I told them that my head is spinning and my vision is blurry because of a headache that I had.").

The record is mixed about whether the officers saw any vomit. The parties agree that Officer Conditt saw no vomit. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 25 (Dckt. No.

141).  But the parties disagree about whether Officer Jefferson saw any vomit.  *Id.* at ¶ 23.
Officer Jefferson testified that he saw no vomit.  *Id.*  But Willis testified that Officer Jefferson
saw the vomit for himself.  *Id.*  He testified:  "As soon as they opened the door, when they came
out, I was vomiting then."  *See* Willis Dep., at 16:22 – 17:4 (Dckt. No. 137-1, at 5 of 23); *id.* at
16:15-16 ("Jefferson and the other officers saw the state I was in by me vomiting and stuff like
that . . . .").

Officer Jefferson then grabbed a wheelchair from inside the hospital, and transported
Willis in the wheelchair to the hospital holding area.  *See* Pl.'s Resp. to Defs.' Statement of
Facts, at ¶ 27 (Dckt. No. 141).

Another officer, Don Quarles, helped Willis get out of the van and into the wheelchair.
*Id.* at ¶ 10.  Officer Quarles did not hear Willis tell anyone that he was feeling ill.  *Id.* at ¶ 47.
Officer Quarles did not see any vomit on Willis's clothes, either.  *Id.*  But according to Willis,
Officer Quarles was "aware of what [he] was going through medically" (whatever that means)
when he got out of the van.  *Id.* at ¶ 46.

Officer Jefferson accompanied Willis from the holding area to the neurology
appointment.  *Id.* at ¶ 33.  The travel took about 10 minutes.  *Id.*  Willis never mentioned feeling
nauseated, dizzy, sick, or anything similar.  *Id.*  Officer Jefferson did not notice any such signs,
either.  *Id.*

Officers Jefferson and Conditt went to the appointment with Willis.  *Id.* at ¶ 35.  Officer
Jefferson heard Willis complain to the doctor that he was experiencing "light-headedness,
fainting spells," and possibly "blurred vision."  *See* Defs.' Resp. to Pl.'s Statement of Additional
Facts, at ¶ 62 (Dckt. No. 145).

A nursing note from Willis's neurology visit stated that he "was seen and discharged from [the neurology] clinic without incident." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 52 (Dckt. No. 141).

After the appointment, Officers Jefferson and Conditt escorted Willis back to the hospital holding room. *Id.* at ¶ 35. During the trip back to the holding area, Willis did not tell Officer Conditt that he was feeling dizzy or nauseated. *Id.* at ¶ 36.

Willis spent about 15 or 20 minutes in the holding area after his neurology appointment. *Id.* at ¶ 37. At some point, he needed to go to the bathroom. *Id.* at ¶ 38.

Willis asked the correctional officers in the holding area – Defendants Jefferson, Quarles, Faulkner, and Davis – to take off his restraints so that he could go to the bathroom. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 67 (Dckt. No. 145).

The practice during prior hospital visits is disputed. That is, the parties disagree about whether, during prior trips to the hospital, officers had removed his restraints when Willis needed to go to the bathroom. *Id.* at ¶ 64.

Officer Faulkner, a correctional officer on the scene, testified that he couldn't recall assisting Willis with the bathroom before. *See* Faulkner Dep., at 11:12-16 (Dckt. No. 137-5). But Willis testified that Officer Faulkner and other officers had removed his restraints when he had to go to the bathroom during earlier hospital visits. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 64 (Dckt. No. 145).

Officer Jefferson had supervised Willis during prior hospital visits. The parties agree that Officer Jefferson did not recall ever helping Willis use the bathroom during any other trip. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 44 (Dckt. No. 141).

Stateville has policies about security restraints during medical visits, for obvious reasons. Officers may remove an inmate's restraints only in limited circumstances. At a medical facility, officers must "ensure that, any time the offender is out of bed, the offender is minimally restrained with leg irons and handcuffs, unless approved by the D.A.O. [Duty Administrative Officer]." *Id.* at ¶ 59.

Removing the restraints requires the approval of both a doctor and an Assistant Warden. Stateville policy mandates that "[s]ecurity restraints . . . shall only be removed for medical reasons by order of the attending physician or emergency room staff **and** the Assistant Warden or above." *Id.* at ¶ 57 (emphasis in original); *see also* Institutional Directive, at § II(E)(5) (Dckt. No. 138-1, at 5 of 10).

The policy addresses how to secure a prisoner when he is inside and outside the exam room.

When a prisoner is "in the medical facility room," correctional officers must follow certain protocols to ensure security. *See* Institutional Directive, at § II(E)(5)(b) (Dckt. No. 138-1, at 6 of 10); *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 57–59 (Dckt. No. 141); Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 63 (Dckt. No. 145). The policy dictates where and how a prisoner should be chained.

"While in the medical facility room, offender's leg irons shall be attached to both legs and deadlocked." *See* Institutional Directive, at § II(E)(5)(b). The waist chain "shall be taken around the bed frame and secured to the leg irons using the padlock," and "[o]ne arm shall be secured to the bed rail at all times using one set of handcuffs and deadlocked." *Id.*

While "in the medical facility room," if "there is a need to remove the restraints for any reason," then the officers must follow 10 steps. *Id.* The first step is to "[c]ontact the Shift

Supervisor for approval." *Id.* at § II(E)(5)(b)(1). A later step addresses using the bathroom (again, while inside the exam room). "In the event the inmate is up to use the bathroom, the inmate will be secured to the handrail using the extra set of handcuffs." *Id.* at § II(E)(5)(b)(8).

The policy also addresses how to handle the inmate "[w]hile *outside* of the room." *Id.* at § II(E)(5)(d) (emphasis added). When outside a treatment room, "the inmate should be handcuffed and legs should be shackled, unless authorized by physician for medical purposes in writing (Doctor's written order) and the Shift Commander/Back-up D.A.O. has been notified." *Id.*; *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 58 (Dckt. No. 141); Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 63 (Dckt. No. 145).

That policy provides the regulatory backdrop for the requests that Willis made during the day in question. Willis asked a couple of times for the officers to remove the handcuffs so that he could use the bathroom. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 67 (Dckt. No. 145). The officers refused. *Id.*

Willis testified: "I was told, no, we are not taking the restraints off you, you just better pray you don't fall." *Id.*; *see also* Willis Dep., at 22:3-5 (Dckt. No. 137-1, at 8 of 23).

The parties disagree about who heard Willis ask for help. For example, Officer Jefferson and Officer Quarles testified that they did not hear Willis ask for help using the bathroom. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 43, 49 (Dckt. No. 141). But Willis testified that he asked for help in a way that all of the officers could hear. *Id.*; *see also* Willis Dep., at 37:14 – 38:13 (Dckt. No. 137-1, at 11–12 of 23).

Willis presented evidence that the officers were laughing when they refused to remove his restraints. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 67, 69 (Dckt.

No. 145); *see also* Willis Dep., at 22:8-9 (Dckt. No. 137-1). He offered affidavits from two other

inmates. *See* Williams Aff. (Dckt. No. 141-1); Joe Aff. (Dckt. No. 141-2).

After the officers refused to remove the restraints, Willis asked the officers to hold the

back of his restraints so that he wouldn't fall while using the bathroom. *See* Defs.' Resp. to Pl.'s

Statement of Additional Facts, at ¶ 68 (Dckt. No. 145). Again, they refused. *Id.*

So, Willis needed to go to the bathroom. But the officers wouldn't remove the restraints,

and they wouldn't hold his restraints, either. At that point, Willis got out of the wheelchair. He

stood up and walked to the bathroom, without assistance. *Id.* at ¶ 39. He relieved himself

without assistance, too. *Id.* He then walked out of the bathroom. *Id.*

After exiting the bathroom, he fell. *Id.* at ¶ 40. None of the officers saw him fall.

Officer Jefferson heard a scream. *Id.* at ¶ 41. Officer Jefferson walked around the

partition separating the officers from the inmates, and he found Willis lying on the ground. *Id.*

Willis was lying on his side, about one foot outside of the bathroom door. *Id.* at ¶ 42.

Officer Quarles was in the holding area when Willis fell. *Id.* at ¶ 48. Officer Quarles

didn't see Willis fall, but he did see Willis lying on the floor outside the restroom. *Id.*

After the fall, Officer Jefferson and Officer Conditt took Willis to the Emergency

Department. *Id.* at ¶ 50. They stayed with Willis for about 30 minutes before Defendant Davis

(an IDOC correctional officer) relieved them of their duties. *Id.*

Willis received an exam. The medical records include a statement by Willis: "I was in

the neurology clinic being evaluated for a headache and dizziness and while I was in the clinic I

fell and struck my head and LOC [loss of consciousness] for a few minutes." *See* Medical

Notes, at 44 (Dckt. No. 137-6, at 3 of 22).

Apparently, the injury did not look serious. The Emergency Department prepared a nursing note on the afternoon of May 5. Willis had no neurological symptoms, and was "moving all extremities appropriately." *See* Medical Notes, at 43 (Dckt. No. 137-6, at 2 of 22) ("Neurological Symptoms: None"); *id.* at 45 (Dckt. No. 137-6, at 4 of 22).

Willis reported neck pain. *Id.* at 45. But Willis had "[n]o signs of trauma noted to the forehead, no bruising or bleeding." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 51 (Dckt. No. 141); *see also* Medical Notes, at 45 (Dckt. No. 137-6, at 4 of 22).

Willis did, however, suffer a neck injury. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 61, 70 (Dckt. No. 145); Medical Notes, at 176 (Dckt. No. 137-6, at 17 of 22). He suffered a shoulder injury, too. *See* Willis Dep., at 24:20-23 (Dckt. No. 137-1, at 8 of 23).

Willis testified that he broke his neck. According to Willis, he suffered a C2 fracture. *Id.* at 24:16-23.

The medical records seem to paint a mixed picture. By the look of things, it seems that there was initial concern about a potential fracture based on a CT scan. But an MRI showed no fracture. "No evidence of acute fracture or subluxation. . . . There was concern for C2 fracture on CT C-spine but MRI revealed no evidence of acute fracture." *See* Medical Notes, at 117 (Dckt. No. 137-6, at 11 of 22); *id.* at 110 (Dckt. No. 137-6, at 12 of 22) ("He was taken to ER, HD stable and imaging showed normal HCT but showed concerning findings for 'hariline' [sic] cervical fracture per NSGY (Discrepant report from Radiology)."); *id.* at 176 (Dckt. No. 137-6, at 17 of 22).

Defendants take issue with the notion that Willis broke his neck. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 70 (Dckt. No. 145). They point out that Willis is not a medical expert, and that the medical records do not support the notion that he broke his neck. *Id.*

On May 7, 2017, two days after the fall, a hospital note stated that Willis had "never syncopized [fainted] before," but that he had suffered "intermittent dizziness for the past year." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 53 (Dckt. No. 141). A note from a May 8, 2017 medical consultation about the fall stated that Willis "often feels lightheaded when getting up," but that he had no other "issues with exertional capacity." *Id.* at ¶ 54.

About a month later, on June 5, 2017, the hospital prepared a final report. It stated that Willis "ha[d] no limitations in terms of normal activities." *Id.* at ¶ 55.

Willis received a medical permit for a wheelchair on June 19, 2017. *Id.* at ¶ 56; *see also* IDOC Medical Permit (Dckt. No. 137-6, at 22 of 22). There is no prior permit for a wheelchair in his medical records. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 56 (Dckt. No. 141).

Willis later filed a *pro se* complaint against several of the officers. *See* Cplt. (Dckt. No. 1). Judge Dow presided over the case for the first few years of its life, and appointed counsel for Willis.[1]

Plaintiff's counsel later filed an amended complaint, and then a second amended complaint. The second amended complaint included deliberate indifference claims under the Eighth and Fourteenth Amendments against Officer Jefferson, Officer Conditt, Officer Quarles, Officer Faulkner, and Officer Davis. *See* Second Am. Cplt. (Dckt. No. 86).

Portions of the second amended complaint also invoked the Americans with Disabilities Act, and the Rehabilitation Act. *Id.* at ¶ 1. The parties later filed a stipulation of dismissal of

---

[1] The Court thanks Plaintiff's counsel for the capable *pro bono* service.

those claims.  *See* Stipulation of Dismissal (Dckt. No. 121); 3/20/23 Order (Dckt. No. 122).  So only the deliberate indifference claims are left.

After discovery, Defendants moved for summary judgment.

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See* Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences.  *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016).  The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists.  *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).  Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant.  *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

The Eighth Amendment prohibits cruel and unusual punishment. *See* U.S. Const. amend. VIII. Punishment by incarceration creates a duty to provide medical care, and the "denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose." *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

For that reason, the Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* at 104 (citation omitted); *see also Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Inflicting pain without penological purpose is punishment. *See Whitley v. Albers*, 475 U.S. 312, 319 (1986).

Deliberate indifference requires more than negligence. *See Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). "Deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." *Id.* Medical malpractice "does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. The Framers were not members of the plaintiffs' bar.

To prevail on a deliberate indifference claim, a plaintiff must show that (1) he suffered from a serious medical condition, and (2) the officer was deliberately – *i.e.*, subjectively – indifferent. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The standard is part objective, part subjective. *See Munson v. Newbold*, 46 F.4th 678, 681 (7th Cir. 2022). The medical condition must be objectively serious, and the defendant must be "subjectively aware of and deliberately indifferent to that serious medical need." *Id.*; *see also Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 763 (7th Cir. 2021).

When describing the standard, the adjectives do much of the heavy-lifting, and raise the bar. "A prison official's '*deliberate* indifference' to a *substantial* risk of *serious* harm to an inmate violates the Eighth Amendment." *See Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (emphasis added).

Defendants argue that Willis has not met his evidentiary burden on either prong. As they see it, Willis has not come forward with evidence that he suffered from an objectively serious medical condition, or that Defendants acted with deliberate indifference. The Court will address each argument, in turn.

## I. Objectively Serious Medical Condition

The first question is whether Willis has offered evidence that his medical condition was sufficiently serious to give rise to an Eighth Amendment claim. On this record, the Court concludes that no reasonable jury could find that Willis suffered from an objectively serious medical condition.

All too often, parties breeze by the first element of the claim (an objectively serious medical condition), and jump right to the second element (deliberate indifference). In many cases, the existence of an objectively serious medical condition is assumed, or is not disputed, so the cases turn on the deliberate indifference prong.

At some point, one could be forgiven for thinking that the case law almost takes the first element for granted, as if medical conditions are presumed to be serious. One could be forgiven for wondering if there is a soft, unspoken presumption that most medical conditions are serious.

But sometimes, a case comes along where the first element requires greater scrutiny and a closer look. It is worth pausing to consider whether a medical condition is, as the Supreme Court requires, "sufficiently serious." *See Farmer*, 511 U.S. at 834. This case is a good example.

To succeed on an Eighth Amendment deliberate indifference claim, a plaintiff must show that he suffered from an "objectively, sufficiently serious" medical condition. *Id.*; *see also Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). "Serious" is a relative term. All of us are created equal, but medical conditions are not. Not all medical conditions count. The condition in question must be "serious."

A plaintiff can demonstrate an objectively serious medical condition at least two ways. A plaintiff can point to a condition that "a physician has diagnosed as needing treatment." *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016).[2] Or a plaintiff can show that he suffers from a condition so objectively serious that "even a lay person would easily recognize the necessity for a doctor's attention." *Id.* "A condition can be 'obvious' to a layperson even where he or she is unable to diagnose or properly identify the cause of an observed ailment." *Orlowski v. Milwaukee Cnty.*, 872 F.3d 417, 423 (7th Cir. 2017).

The key point is that the serious medical condition must pose a danger or a substantial risk of harm or suffering. A plaintiff "must show that he faced a *substantial risk* due to [his] objectively serious medical condition." *Palmer v. Franz*, 928 F.3d 560, 563 (7th Cir. 2019) (emphasis added).

When considering whether a condition is objectively serious, courts consider whether there are: "(1) conditions that could result in further injury or unnecessary and wanton infliction

---

[2] One wonders if that recitation of the standard is a little low. Not every medical condition that needs medical care is a serious medical condition. The word "serious" has to mean something. If every medical condition that needs medical care is an objectively serious medical condition, then the modifier "serious" would lose its meaning. It has the feel of Lake Wobegon, where "all the women are strong, all the men are good-looking, and all the children are above average." *See Lake Wobegon Effect*, Oxford Reference, https://www.oxfordreference.com/display/10.1093/oi/authority.20110810105237549 (last visited Jan. 19, 2024).

of pain if not treated; (2) injuries that a reasonable doctor or patient would find important and worthy of comment or treatment; (3) conditions that significantly affect an individual's daily activities; or (4) conditions that produce[] chronic and substantial pain." *Greyer v. Allen*, 2023 WL 6847068, at *6 (N.D. Ill. 2023) (citing *Hayes*, 546 F.2d at 522–23); *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997).

Not "every ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim." *Gutierrez*, 111 F.3d at 1372. "A prison's medical staff that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue – the sorts of ailments for which many people who are not in prison do not seek medical attention – does not by its refusal violate the Constitution. The Constitution is not a charter of protection for hypochondriacs." *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996); *see also Gutierrez*, 111 F.3d at 1372 ("All of this is not to say, however, that every ache and pain or medically recognized condition involving some discomfort can support an Eighth Amendment claim, for clearly that is not the case.").

A "medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). But the "illness or injury for which assistance is sought" must be "sufficiently serious or painful to make the refusal of assistance uncivilized." *Cooper*, 97 F.3d at 916.

At the end of the day, the constitutional text provides the touchstone. The condition must be serious enough – and the treatment of the inmate must be severe enough – to amount to "punishment." *See* U.S. Const. amend. VIII; *see also Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021).

15

With those guideposts in mind, this Court takes another look at the facts at hand. Based on the record as a whole, viewing everything in a light favorable to Willis as the non-movant, no reasonable jury could conclude that Willis suffered from an objectively serious medical condition.

The story begins with a trip to the hospital for a neurological appointment. Before he got in the van, Willis was able to walk, and did not require a wheelchair. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 11, 16 (Dckt. No. 141). He was not suffering from a physical disability. *Id.*

Willis didn't sound any alarms about his health, either. Before he got in the van, Willis did not tell the officers that he was feeling sick. *Id.* at ¶¶ 18–19. And during the trip to the hospital, Willis didn't tell the officers that he was feeling ill. *Id.* at ¶ 20.

Willis testified that he threw up en route to the hospital. *Id.* at ¶ 22. When he arrived, he was vomiting. *See* Willis Dep., at 16:15 – 17:4 (Dckt. No. 137-1, at 5 of 23). He told the officers that he was nauseous, and felt "a little" dizzy. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 26 (Dckt. No. 141). He couldn't see straight, and the room was spinning. *Id.* at ¶ 26; *see also* Willis Dep., at 16:10-12, 39:3-5. He had a migraine headache, too. *See* Willis Dep., at 17:12-14.

Vomiting is undeniably unpleasant. It can be a sign of a bigger, deeper problem. For that reason, sometimes vomiting can support a finding of an objectively serious medical condition. *See Greeno v. Litscher*, 13 F. App'x 370, 375 (7th Cir. 2001) (holding that an inmate who "suffered from stomach pains and vomiting of *blood* for *over two years*" suffered from an objectively serious medical condition) (emphasis added); *Greeno v. Daley*, 414 F.3d 645, 653

16

(7th Cir. 2005) ("A lay person would recognize the need for a doctor's care to treat severe heartburn and frequent vomiting.").

But most of the time, vomiting isn't an objectively serious medical condition unless it is unusually severe (*e.g.*, blood) or unusually frequent. Courts typically find that vomiting isn't serious enough to give rise to a potential claim under the Eighth Amendment. *See, e.g.*, *Gayton v. McCoy*, 593 F.3d 610, 621 (7th Cir. 2010) ("Vomiting, in and of itself, is not an uncommon result of being mildly ill, and, absent other circumstances . . . does not amount to an objectively serious medical condition."); *Holland v. Indiana*, 2021 WL 1600336, at *1 (N.D. Ind. 2021) ("Vomiting and diarrhea from food poisoning, while uncomfortable and unpleasant, does not usually send a person to the hospital, and often passes in short order."); *Palafox v. Lucas*, 2017 WL 1197215, at *5 (S.D. Ill. 2017) (holding that plaintiff's general testimony that he told nurses he was "weak, dizzy, and had a headache" was insufficient to show that he had an objectively serious medical condition); *Turner v. Boughton*, 2023 WL 6647117, at *1 (W.D. Wis. 2023) ("[S]harp abdominal pains, nausea, lightheadedness, a brief period of high blood pressure, and diarrhea [] were not severe enough to support an Eighth Amendment claim.").

By way of analogy, sometimes asthma can be serious enough to give rise to an Eighth Amendment claim, and sometimes not. It depends on what the person was going through. *Compare Board v. Farnham*, 394 F.3d 469, 484 (7th Cir. 2005) (noting that asthma "can be, and frequently is, a serious medical condition, depending on the severity of the attacks"), *with Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir.1999) (holding that an inmate's "breathing problems, chest pains, dizziness, sinus problems, headaches, and a loss of energy" were not serious enough to give rise to an Eighth Amendment claim).

Imagine entering the federal courthouse, and seeing someone throw up in the lobby. Your heart would undoubtedly go out to that person. And, in a charitable spirit, you might try to lend a hand. But most people probably wouldn't think that the person needed to see a doctor, either. You would probably tell that person to go home, not go to the hospital.

Vomiting normally does not require medical treatment by a physician, except in extreme cases. It usually cures itself. A nap usually does it. Vomiting, headaches, and dizziness are not particularly unusual or serious, either. Similar symptoms are known to exist on college campuses on weekends, without the need to see a doctor.

If Willis had a history of throwing up, or threw up for an extended period of time at the hospital, or vomited blood, or something along those lines, then maybe the case would be strong enough to get to the jury. But a solitary bout of vomiting, without more, isn't enough.

In a similar vein, Willis testified that he had a migraine headache. Migraines can be debilitating, without question. But headaches, standing alone, don't usually require a doctor visit. *See Collins v. Aramark Food Services*, 2022 WL 1469374, at *2 (N.D. Ind. 2022) ("The migraine headaches and upset stomachs described here, while uncomfortable and unpleasant, do not usually send a person to the hospital."); *see also Hammond v. Briley*, 2004 WL 413293, at *7 (N.D. Ill. 2004) ("Even if the court were to assume that there was a link between the plaintiff's need for new glasses and his headaches and nausea, the plaintiff's symptoms were not serious enough to implicate Eighth Amendment concerns.").

There isn't much in the record about the severity of the migraine that Willis was suffering that day, or how long it lasted, or the frequency of his migraines generally. By the look of things, Willis did not complain about his migraine after he entered the hospital.

The record is also unclear about whether the neurological appointment had to do with migraines, or with something else. At best, the transfer summary suggests that the appointment was about the migraines, because it lists nothing except "Migraine Headaches" under the header "Current / Acute Conditions / Problems." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 15 (Dckt. No. 141); *see also* Transfer Summary (Dckt. No. 137-1). Even so, the record doesn't reveal anything about the frequency or severity of his migraines.

Based on this record, there isn't much to go on. It's not enough for a reasonable jury to conclude that the headache was sufficiently serious to give rise to Eighth Amendment concerns.

The events after Willis arrived at the hospital could not support a finding that Willis suffered from an objectively serious medical condition, either. After getting out of the van, Willis entered the hospital, and traveled by wheelchair.

If anything, his medical condition stabilized. There is no evidence that his medical condition continued to deteriorate.

The record does not include evidence that Willis continued to vomit when he was inside the hospital. It took about 10 minutes to travel to his appointment, and Willis did not mention feeling nauseated, dizzy, sick, or anything similar. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 33 (Dckt. No. 141).

And then, Willis saw a doctor. Willis complained to the doctor that he was experiencing "light-headedness, fainting spells" and possibly "blurred vision." *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 62 (Dckt. No. 145).

But there is no evidence that he complained about the vomiting. There is no evidence that he requested or received treatment for the vomiting.

And there is no evidence that he complained about an inability to stand or walk. The physician did not prescribe, or even recommend, use of a wheelchair. The doctor didn't tell Officer Jefferson that Willis needed help walking or standing, let alone that he needed help using the bathroom.

The fact that Willis saw a doctor shortly before the accident looms large. He saw a doctor shortly before the fall. But the doctor did not treat the vomiting, and did not order any remedial treatment based on a failure to walk or stand. The doctor did not order a wheelchair, or a walker, or crutches, or a cane, or any other type of assistance with walking, moving, or standing. Vomiting and mobility issues were not serious enough to garner medical treatment.

In many cases, there is room to debate what a doctor would have said if a physician had examined the inmate at the time. But here, there is no room for debate, because an exam actually happened. Willis saw a physician shortly before he took a spill. And the doctor did not diagnose any problems or dictate any treatment for a failure to stand, or walk, or move.

Again, an objectively serious medical condition is a condition that "a physician has diagnosed as needing treatment," or that a layperson would recognize. *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016). But here, Willis *did* see a doctor, and the doctor didn't diagnose any need for assistance or treatment with walking or standing.

After the appointment, Willis returned to the holding area. En route, Willis did not tell Officer Conditt that he was feeling dizzy or nauseated. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 36 (Dckt. No. 141). Willis then waited in the holding area for another 15-20 minutes. *Id.* at ¶ 37. All the while, he did not vomit.

That's when Willis asked to go to the bathroom. At first, he asked the guards to remove his restraints. And then, he asked someone to hold the restraints while he relieved himself.

20

When they refused, Willis got out of the wheelchair, walked to the bathroom, and relieved himself.  After leaving the bathroom, Willis fell, and based on his testimony, he suffered a serious injury.[3]

The question is not whether the *neck injury* was objectively serious.  The question is whether he suffered from an objectively serious medical condition beforehand, when the guards refused to lend a hand before the fall.

Based on this record, no reasonable jury could conclude that he suffered from an objectively serious medical condition.  The record confirms that Willis vomited within an hour or so before the fall.  He had some lightheadedness and blurry vision, plus a headache.

If those medical conditions count as an objectively serious medical condition, then it is hard to see what wouldn't qualify.  The adjective and the adverb would be scrubbed from the Supreme Court's standard:  an "objectively serious" medical condition.

Willis looks for support in *Foelker v. Outagamie Cnty.*, 394 F.3d 510 (7th Cir. 2005), but it does not lend a hand.  In that case, the inmate experienced withdrawal symptoms after not receiving a prescribed dosage of methadone.  *Id.* at 512.

Foelker's symptoms included defecating on himself and the floor of his cell, and hallucinating that he was about to get married at the "wedding hotel."  *Id.* at 512–13.  The Seventh Circuit concluded that Foelker's symptoms showed he suffered from a serious medical condition, even though he did not appear distressed.  *Id.* at 513.

*Foelker* is not on all fours, to say the least.  Nausea and dizziness do not rise to the same level as hallucinating and defecating on oneself.

---

[3] Part of the claim involves the theory that the guards should have held his restraints while he was in the act of relieving himself.  That theory doesn't seem to fit with the facts of the case.  Willis didn't fall while urinating.  He fell when he was done, after exiting the bathroom.

Nausea and dizziness are symptoms of mild illness that many Americans experience. Hallucinations and inability to control bowel functions are a sign of a more serious problem, particularly when the individual with those symptoms is totally unfazed by the whole thing.

For their part, Defendants cite *Sistrunk v. Khan*, 931 F. Supp. 2d 849 (N.D. Ill. 2013), to show that Willis's medical condition was not objectively serious. *Sistrunk* is on point.

There, the plaintiff's physical therapist and hospital doctors recommended for him to get a wheelchair. *Id.* at 857. The plaintiff experienced dizziness and weakness, but his leg was uninjured and could support weight. *Id.* at 858. So, the court concluded that the plaintiff had no objectively serious medical need for a wheelchair (and could be given crutches instead). *Id.*

Here, unlike in *Sistrunk*, no medical provider recommended that Willis use a wheelchair. No medical provider recommended that Willis receive bathroom assistance, either.

Willis has not offered evidence showing that his condition worsened in the time between his neurology appointment and his fall. So, Willis did not have an objectively serious medical condition – readily observable to a lay person – that required a wheelchair or bathroom aid.

It is no answer to say that the jury should simply figure out whether Willis suffered from an objectively serious medical condition. That answer skips over an antecedent question: when is there enough evidence in the record to throw the question to the jury in the first place? A district court must first decide if there is enough evidence to create a "genuine" issue of fact. *See* Fed. R. Civ. P. 56(a). The jury can't decide a question of fact unless a reasonable jury could side in favor of the non-movant. And on this record, no reasonable jury could.

By the sound of things, Willis undoubtedly experienced physical discomfort. No one wants to vomit, or feel lightheaded, or anything along those lines. All of us have been there, and none of us want to go back.

Even so, those symptoms are common, and are not particularly serious. A child with those symptoms would go home from school. Most adults with those symptoms would go home from work, too. But vomiting and a headache, without more, are not sufficiently serious to require medical attention by a physician.

The Supreme Court has drawn a line for Eighth Amendment purposes. Only an objectively serious medical condition can give rise to a claim, and Willis's medical condition does not fall on the serious side of the line.

On this record, no reasonable jury could conclude that Willis suffered from an objectively serious medical condition before he fell, so he has no claim under the Eighth Amendment.

## II.     Deliberate Indifference

Willis's claim fails for a second, independent reason. On this record, no reasonable jury could conclude that the officers showed deliberate indifference to a substantial risk of serious harm.

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). To satisfy the subjective element, Willis must demonstrate that Defendants were "both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and actually drew the inference." *Jones v. Mathews*, 2 F.4th 607, 612 (7th Cir. 2021) (cleaned up); *see also Farmer*, 511 U.S. at 837. That is, deliberate indifference means that the defendant "knew that the inmate faced a substantial risk of serious harm, and yet disregarded that risk by failing to take reasonable measures to address it." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008).

"Deliberate indifference describes a state of mind more blameworthy than negligence, and it is the plaintiff's burden to show that the defendants acted with a sufficiently culpable state of mind." *Jones*, 2 F.4th at 612–13 (cleaned up). "The deliberate indifference standard reflects a mental state somewhere between the culpability poles of negligence and purpose, and is thus properly equated with reckless disregard." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015).

Willis points to evidence about how the officers responded when he asked for the removal of his restraints, and asked for help using the bathroom. He testified that they laughed, and belittled and mocked his requests. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 68 (Dckt. No. 145). Willis testified that he "was told, no, we are not taking the restraints off you, you just better pray you don't fall." *Id.* at ¶ 67; *see also* Willis Dep., at 22:3-5 (Dckt. No. 137-1, at 8 of 23).

That evidence speaks to the subjective state of mind of the officers. That's part of the equation, but it's *only* part of the equation. A culpable state of mind isn't enough. A plaintiff must come forward with evidence that the defendant was indifferent to a "substantial risk of serious harm." *Townsend*, 522 F.3d at 773.

The existence of *some* risk isn't enough. To prevail, an inmate must prove that the defendant "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 838.

"A prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,' a standard that incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" *Farmer*, 511 U.S. at 845 (citation omitted). The Eighth Amendment comes into play if there is an "unreasonable risk of serious damage to [an inmate's] future health." *See Helling v. McKinney*, 509 U.S. 25, 35 (1993).

24

The standard is high, as reflected in the constitutional text. The claim, after all, is about cruel and unusual punishment. *See* U.S. Const. amend. VIII. For that reason, "the deprivation alleged must be, objectively, 'sufficiently serious;' a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.'" *See Farmer*, 511 U.S. at 834.

The Constitution does not require a prison to be risk-free. "The Eighth Amendment demands that officials ensure 'reasonable safety,' not that they protect against all risks." *See Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) (quoting *Farmer*, 511 U.S. at 844–45); *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001) (holding that the Eighth Amendment does not require a "maximally safe environment").

The fact that Willis ultimately fell and suffered an injury does not come into play when evaluating whether the guards showed deliberate indifference. The question is whether the situation posed a substantial risk of serious harm, measured on the front end. The Eighth Amendment does not rest on 20/20 hindsight. *See, e.g.*, *Wilson v. Cook Cnty.*, 742 F.3d 775, 782 (7th Cir. 2014) (explaining that deliberate indifference cannot rely on "20/20 hindsight"); *O'Brien v. Indiana Dep't of Correction ex rel. Turner*, 495 F.3d 505, 509 (7th Cir. 2007); *Sanville v. McCaughtry,* 266 F.3d 724, 736 (7th Cir. 2001) (recognizing that physicians cannot "practice with a crystal ball in hand"); *Schaub v. VonWald*, 638 F.3d 905, 915 (8th Cir. 2011) ("Deliberate indifference must be measured by the official's knowledge at the time in question, not by hindsight's perfect vision.") (cleaned up).

Based on the record at hand, a reasonable jury could not find that Willis faced a "substantial" risk of "serious" harm by using the bathroom in restraints, without assistance.

The reason ties back to Willis's medical condition at the time. Willis was not a senior citizen. He was in his late 30s. *See* Medical Notes (Dckt. No. 137-6, at 20 of 22) (describing Willis as a "39-year-old gentleman"). He was not disabled, and was not paralyzed. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 11 (Dckt. No. 141). He didn't have a medical permit for a wheelchair. *Id.* at ¶ 16. There is no evidence that he had a history of falling.

Viewing the evidence in his favor, Willis vomited when he arrived at the hospital. He told one of the officers that he felt "a little dizzy and like he had to throw up." *Id.* at ¶ 26. That's when he got a wheelchair.

In the hospital, while en route to the doctor, Willis didn't say anything about feeling dizzy. *Id.* at ¶ 33. Willis told the doctor that he was experiencing "light-headedness, fainting spells," and possibly "blurred vision." *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 62 (Dckt. No. 145). After the exam, Willis did not say anything to the officers about feeling dizzy. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 36 (Dckt. No. 141).

A reasonable jury could find that Willis vomited, and experienced nausea and dizziness. Even so, the standard is a high bar. The question is not whether it would have been safer to remove or hold the restraints. The question is whether Willis faced a "substantial" risk of "serious" harm.

The doctor apparently didn't think so. The doctor did not prescribe any treatment for Willis based on his nausea or dizziness. The doctor did not dictate any treatment for moving or standing, or suggest any assistance or restriction. The doctor did not direct, for example, that Willis needed a wheelchair for medical reasons.

The officers on the scene were entitled to rely on the medical treatment provided by a doctor, including the lack of any treatment for dizziness. The Seventh Circuit has "long

recognized that the division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment." *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019).

"Absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.* at 1049–50 (cleaned up); *see also Gilbert v. Frazier*, 932 F.2d 971 (7th Cir. 1991) (opining that non-doctor prison officials who relied on doctor's assessment in denying prisoner access to a wheelchair did not act with deliberate indifference).

What's more, the situation that Willis faced was not particularly perilous, even if he felt some dizziness. He was not walking down a flight of stairs with a broken foot, or anything along those lines. *See Anderson v. Morrison*, 835 F.3d 681, 683 (7th Cir. 2016) ("Forcing someone to walk handcuffed and unaided down stairs needlessly strewn with easily removable milk, food, and garbage, as Anderson alleges, poses an unreasonable peril."); *Henard v. Green*, 10 F. App'x 357 (7th Cir. 2001). He was walking on a flat surface. He was going to the bathroom by himself, while restrained.

There is no evidence that the floor was slippery, or that anything was blocking his path on the floor. Even if the floor had presented a peril, it would not give rise to a claim. *See Pyles v. Fahim*, 771 F.3d 403, 410 (7th Cir. 2014) ("Federal courts consistently have adopted the view that slippery surfaces and shower floors in prisons, without more, cannot constitute a hazardous condition of confinement."); *Hardin v. Baldwin*, 770 F. App'x 289, 290 (7th Cir. 2019) ("The condition that [the plaintiff] identifies is the uneven sidewalk, but the risk of tripping there is no worse than the risk present on slippery floors in prison showers."); *Bell v. Ward*, 88 F. App'x

125, 127 (7th Cir. 2004) ("Although wet floors do present a possibility that inmates might slip, Bell's allegations do not suggest a *substantial* risk of serious harm that reflects the deliberate indifference required to impose liability under the Eighth Amendment.") (emphasis in original); *Conard v. James*, 2022 WL 1443388, at *2 (S.D. Ill. 2022) ("Federal courts have generally concluded that slippery floors by themselves, do not amount to an Eighth Amendment violation because they constitute a risk faced by members of the public at large, and the possibility of falling on them does not constitute a substantial risk of serious harm."); *Owens v. Carter*, 2017 WL 4682812, at *2 (S.D. Ind. 2017) ("[F]ederal courts are consistent in holding that slip-and-fall incidents, whether on ice, water, or slippery floors, do not meet the deliberate indifference standard of Eighth Amendment conditions of confinement claims.") (collecting cases).

If walking on a slippery surface is not enough to give rise to a constitutional claim, then it's hard to see how walking on an *unslippery* surface after feeling dizzy could give rise to a claim. Both involve a risk of falling.

The officers did not have reason to believe that Willis faced imminent peril. Willis did ask for help. But Willis didn't tell the officers that he couldn't stand or walk. And in fact, he could stand and walk. When the officers refused, he got out of the wheelchair and walked into the bathroom.

Maybe that situation poses a risk of some kind. But a "substantial" risk of "serious" harm? No reasonable person could think so.

The simple reality is that lots of people go to the bathroom (albeit without restraints) feeling the same way, without putting themselves in serious danger. *See Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) ("The risk of injury from a fall onto a concrete floor

is obvious, but the chance that someone would fall is not."). Falling can lead to an injury. But for young people on a flat surface, the injury usually isn't serious.

Willis isn't the first prisoner who had to use the bathroom while shackled. After all, the policy created a strong presumption that a prisoner should be restrained at all times during a medical visit. An officer could remove the restraints only if "authorized by physician for medical purposes" and only if the Shift Commander was notified. *See* Institutional Directive § II(E)(5)(d); Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 58 (Dckt. No. 141).

Yet there is no evidence that any other inmate slipped, fell, and suffered a serious injury. *See Estate of Simpson*, 863 F.3d at 746–47 ("Perhaps tellingly, the record reveals no evidence showing that other obese inmates (or others suffering from alcohol withdrawal) fell off their bunks in Bartholomew Jail, or that anyone else sustained serious injuries.").

Plaintiff's claim is problematic for other reasons, too. Plaintiff's theory of the case seems at odds with the high bar set by the Eighth Amendment, which bans "cruel and usual" "punishment." *See* U.S. Const. amend. VIII. At bottom, Willis contends that the officers violated the Eighth Amendment when they refused to remove his restraints.

It would be strange to read the Eighth Amendment to require guards to remove restraints on prisoners. Handcuffs and shackles, after all, are a necessary part of incarceration. They're a bread-and-butter part of prison – they're an inherent part of the punishment itself. A refusal to remove handcuffs is not an extra layer of "punishment" because the handcuffs are a necessary feature of the punishment. And there is nothing "cruel and unusual" about restraining prisoners, especially when they're outside the prison walls.

A different outcome would potentially create a constitutional duty to help prisoners use the bathroom when they're not feeling great. It is not unusual for prisoners to be restrained, and

it is not unusual for prisoners to have to use the bathroom. If the Eighth Amendment came into play here, going to the bathroom and doing other rudimentary acts in prison would have constitutional implications.

The facts of the case illustrate why courts are leery of injecting themselves in on-the-spot, security-related decisions involving inmates and prisons. Willis asked the guards to remove his restraints so that he could go to the bathroom. It sounds like the opening scene of a bad movie about an escape from prison.

The Eighth Amendment does not turn a blind eye to the challenges of running a prison. A denial of medical care "that causes suffering for no penological purpose" can give rise to an Eighth Amendment claim. *See Harris v. Molinero*, 803 F. App'x 1, 5 (7th Cir. 2020); *see also Estelle*, 429 U.S. at 104; *Sanders v. Kingston*, 53 F. App'x 781, 783–84 (7th Cir. 2002) ("[T]he Eighth Amendment protects inmates only from conditions of confinement that result from intentional punishment by a prison official and not from those that exist solely as a result of a legitimate institutional concern."). Handcuffs serve a penological purpose.

The "no penological purpose" principle does not fit well when an inmate asks to be unshackled, or requests an up-close-and-personal physical proximity to guards. Under IDOC policy, the guard would have been unarmed, thus exposing that person to risk. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 28, 31 (Dckt. No. 141). Recognizing a claim would allow a jury to find that the Eighth Amendment *required* the guards to unshackle Willis or help him in close proximity, unarmed.

The compelling need for security – including the need to prevent flight by prisoners – lurks in the background. "[K]eeping dangerous men in safe custody" is an "unenviable task." *See Farmer*, 511 U.S. at 845. The need to prevent escapes, and to protect the safety of the

officers and those around them, is a legitimate penological interest. It is part of the reason why the Eighth Amendment comes into play only when there is a "substantial risk of a serious harm." *Id.* at 828.

Again, to keep one's constitutional bearings, it is worthwhile to return to the starting point: the constitutional text. The question is whether the record could support a finding of a "punishment." *See* U.S. Const. amend. VIII. A failure to help Willis in the bathroom was not tantamount to the "[u]nnecessary and wanton infliction [] of pain." *See Hope v. Pelzer*, 536 U.S. 730, 737 (2002). And a failure to remove his shackles or lend a hand did not expose Willis to a "substantial risk of serious harm." *Farmer*, 511 U.S. at 828.

On this record, no reasonable jury could conclude that the officer inflicted punishment on Willis by refusing his request to remove his shackles or hold the restraints, even if he was feeling nauseous or dizzy at the time.

## III. Qualified Immunity

Finally, Defendants argue that they are entitled to qualified immunity. They contend that no clearly established right requires officers to provide inmates with wheelchairs or bathroom assistance absent medical indication that the inmate requires such a service. *See* Mtn. for Summ. J., at ¶ 5 (Dckt. No. 136).

Defendants are entitled to summary judgment on the merits, so there is no need to reach the issue of qualified immunity. *See, e.g.*, *Jackson v. Vasquez*, 2023 WL 319530, at *7 n.7 (N.D. Ill. 2023) (declining to address qualified immunity after dismissing claims on the merits); *Whitley v. Albers*, 475 U.S. 312, 328 (1986) ("[O]ur decision that petitioners were entitled to a directed verdict on the merits makes it unnecessary to [review qualified immunity].").

\* \* \*

31

One final note.  Willis testified that he broke his neck, and the medical records do reflect the possibility that he suffered a hairline fracture of some kind.  A neck injury is serious business.  The Court is sympathetic to Plaintiff's injury, and understands the very human dimension of the case.

The Court concludes that the record could not support a finding of a constitutional violation.  But nothing in the ruling diminishes the seriousness of the situation, or the importance of Willis enjoying good health and achieving a full recovery.

## Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted.

Date:  January 19, 2024

Steven C. Seeger
United States District Judge